## Case No. 6,234.

### HAWES v. ANTISDEL.

[2 Ban. & A. 10;[1] 8 O. G. 685.]

Circuit Court, E. D. Michigan. Feb., 1875.

PATENT—WANT OF NOVELTY — EVIDENCE—SUFFICIENCY.

1. In order to defeat a patent on the ground of want of novelty, the proof of prior use or previous knowledge must be such as to establish the fact clearly and beyond a reasonable doubt.

[Cited in Adams & W. Manuf'g Co. v. Rathbone, 26 Fed. 264.]

2. Where the proofs of prior knowledge and use of invention are contradictory, mere preponderance is not sufficient to invalidate the patent. The preponderance must be such as to remove all reasonable doubt.

[Cited in Rogers v. Beecher, 3 Fed. 640; Miller v. Smith, 5 Fed. 364; American Bell Tel. Co. v. People's Tel. Co., 22 Fed. 313; McDonald v. Whitney, 24 Fed. 602.]

3. The complainant's invention was for an "advertising hotel register," and the defendants, seeking to anticipate it, produced witnesses, who testified, from recollection, that the invention was in public use prior to the date when the complainant claimed to have invented it; no advertising hotel register purporting to antedate complainant's invention was put in evidence, and the witnesses were contradicted as to the character of the register claimed to have been previously in prior use: Held, that the evidence was not sufficient to overthrow the complainant's patent.

4. In a case where it is sought to establish the use of a book of a particular character at a certain time, the book itself, duly verified, would be the best evidence of the date of its use.

5. Letters patent No. 63,889, granted to Charles L. Hawes, April 16, 1867, for a "hotel register" held valid.

[This was a bill in equity by Charles L. Hawes against William W. Antisdel for the alleged infringement of letters patent No. 63,-889, granted to plaintiff April 16, 1867, for an advertising hotel register. The defendant alleged that the idea patented was in common use before the date of the patent.]

J. J. Allen, W. W. Taylor, and E. C. Walker, for complainant.

Moore & Griffin, for defendant.

LONGYEAR, District Judge. The patent carries with it a presumption of novelty of the thing patented, and the burden of rebut-

---

[1] [Reported by Hubert A. Banning, Esq., and Henry Arden, Esq., and here reprinted by permission.]

ting that presumption is upon the defendant. In order to defeat the patent on the ground of want of novelty, the proof of prior use or previous knowledge must be such as to establish the fact clearly and satisfactorily, and beyond a reasonable doubt. Where the proofs are contradictory, mere preponderance is not sufficient to sustain the allegation. The preponderance in such case must be such as to remove all reasonable doubt. In Wood v. Cleveland Rolling Mill Co. [Case No. 17,941], Mr. Justice Swayne said: "When the defence is made, it is the duty of courts and juries to give it effect. But such testimony should be weighed with care, and the defence allowed to prevail only when the evidence is such as to leave no room for a reasonable doubt upon the subject."

In Parham v. American Button Hole, etc., Co. [Case No. 10,713], heard before Mr. Justice Strong and Circuit Judge McKennan, the latter, in delivering the opinion of the court, said: "The evidence must establish clearly the priority of a completed and useful machine over the complainant's, or it is unavailing—to doubt upon this point is to resolve it in the negative."

In Sayles v. Chicago & N. W. Ry. Co. [Case No. 12,415], Drummond, J., in a case nicely balanced on the evidence sustained the patent. In Crouch v. Speer [Id. 3,438], Nixon, J., held that the defendant not only assumed the burden of proof of his allegation of want of novelty, but that his undertaking was to show affirmatively prior knowledge and use under such circumstances as to give the public the right of a continued use as against the patentee, and that he fails to do this when his evidence is frequently contradicted, and is inconsistent with itself. These doctrines I believe to be well grounded in principle as well as established by repeated and uniform adjudications.

The invention in question is what is commonly known as the "Advertising Hotel Register," the book being constructed so as to have inserted advertisements at the top and bottom, and on the margin of each page, with a blank space for the registering of names of guests, or on each alternate page, leaving the opposite page blank for registering of such names, or on both pages of each alternate leaf, such leaf being sometimes made of bibulous or blotting paper.

The proofs showed that the complainant perfected his invention and put it into practical use, as early as in May, 1866, and it was to that date the proofs as to prior use and previous knowledge related.

No advertising hotel register book purporting to antedate complainant's invention was put in evidence. Such a book, duly verified, would be the best evidence possible. Each page would be an intelligent speaking unimpeachable witness to its own chronology, and the book itself the best evidence of the date of its use. The case is left to stand exclusively upon the recollections of witnesses, and

at a distance in time from eight to twenty years, and unaided in any single instance by any contemporaneous memorandum or writing whatever. I shall recur to this peculiar aspect of the case in another part of this opinion.

The places where, and the persons by whom, such prior use and previous knowledge are alleged to have taken place and to have existed, and as to which proofs have been made, will be taken up in the order in which they were alleged in the amended answer.

1. Prior use in the Exchange Hotel, at Sturgis, in the state of Michigan, by E. W. Pendleton. Pendleton, with five others, testifies to the use of an advertising register in the hotel named, prior to May, 1866, viz., in 1864 and 1865, and nine witnesses testify to the contrary. That registers of some kind were used in that hotel during the years of 1864 and 1865, and that advertising registers were used in it after May 1866, the testimony on both sides is entirely agreed. The vital question is whether the registers used in 1864 and 1865 were advertising registers, or, what is the same thing, whether the conceded use of advertising registers commenced in that hotel before May, 1866. As to this question the testimony is in direct and irreconcilable conflict. The testimony was taken at a distance of time of from eight to ten years. The witnesses on both sides testify from memory alone, unaided by any memorandum or writing whatever of the fact itself or of concurrent facts. The uncertainty of memory as to dates under such circumstances is well understood; and where, as in this case, the event in question was not one calculated to fix itself in the memory of the persons called to testify, except Pendleton, on account of any interest it was to them, and those persons have equal means of knowledge, are of equal credibility, and apparently of equally sound memory, and they positively disagree, it may well be said in a case like the present that prior use is not made out in the clear and satisfactory manner requisite, as we have seen, in such cases.

Again, Pendleton was subpoenaed by complainant to produce all the hotel registers used in that hotel during the period in question. In response he produced a plain register commencing in April, 1861, and ending April 1, 1864, and also a portion of another, which he testified commenced, according to his best impression, December 20, 1866, and ended in July 1867; but for the period between April, 1864, and December, 1866, he produced no register of any kind; and of the register which he says he thinks, it is his impression, commenced December 20, 1866, there is, according to his judgment, one third missing. Now these are certainly very suspicious circumstances, especially in view of the fact, as appears by his testimony, that he was a defendant in one of the numerous suits then pending, in behalf of this same com-

plainant, for an infringement of the patent here in question. It is true, he attempts to explain the absence of the register, which he says he used (and which he says was an advertising register) during the period between the first register produced and the mutilated one, April 1, 1864, to December 20, 1866; but his explanations appear to the court to be mere guess-work, and are far from satisfactory. He speaks of it having been given to a boy, or, perhaps used up in the house to clean lamps with, but nothing with that degree of certainty requisite in such cases. And as to the missing portion of the register ending July, 1867, he is still more indefinite and unsatisfactory, and in fact offers no explanation whatever which can be considered as such in a case like the present. The importance of requiring strict proof that there was used in that hotel a register between the two produced, becomes the more apparent when we consider that the hiatus from April 1, 1864, the close of the register he does produce, to December 20, 1866, when he thinks the one produced (the mutilated one) commenced, is only two years and a little over seven months, and the length of the time the latter register continued after the latter date is only about six months, making in all just about three years, which is just the length of time the first register produced lasted, and he says they were just about of equal size, thus affording a strong presumption that if the missing portion of the mutilated register had been produced it would have covered the entire time it is pretended an advertising register was used. It is true, he says he thinks the last-named register was not entirely filled up; but the first and last leaves, from which Pendleton says he took his dates, are both missing, and his statement as to the book not being filled up to any considerable extent, especially in view of his interest in the controversy, must be taken with many grains of allowance. The time an advertising register was pretended to have been used (1864 and 1865) may be further accounted for by the use, between the first register produced and the mutilated one, of one of those small registers of one to three quires of paper he says he sometimes used between regular register books, probably while waiting for a new one.

Considering all the circumstances, the proofs fall far short of convincing my mind that there was a use of an advertising hotel register at the Exchange Hotel, in Sturgis, in the state of Michigan, as alleged, prior to the complainant's invention.

2. Prior use in the Michigan House, at Tecumseh, in the state of Michigan, by Mrs. W. H. Hoeg. Four witnesses testify to the use of an advertising register at the place named in 1855, and five, including the then clerk or manager for the proprietor, George R. Southworth, testify to the contrary. Southworth certainly had better means of knowledge, and would be more likely to remember what the fact was, than any of the witnesses testifying to such use at the date mentioned, except perhaps the witness Spafford, who testified that he, being a binder, procured the printing done and himself bound the book and put it into use there, while he was in charge of the hotel during a temporary absence of Southworth. But Southworth was absent only two or three months, and Spafford testifies that the register so put there by him continued to be used there after Southworth's return. So that if ever there was such a register at the time specified, it was there when Southworth returned and resumed the management of the hotel; and he testifies positively that there was no such thing there. He describes what he says was the only book used in the office, to his knowledge, and that was not an advertising register, or, in fact, a register at all as commonly understood. He described it simply as a book in which the names of guests were entered by the clerk and a minute kept of what they had at the hotel. The other four of complainant's witnesses corroborate Southworth, both as to the fact that no advertising register was used there during the time mentioned by Spafford, and as to the description of the book that was used.

In such a conflict of testimony perhaps nothing more need be said than that the case is such that there is such a want of clear and satisfactory proof of prior use and, to say the least, that it is involved in so much doubt that under the rules laid down it must be held that the allegation of prior use at Tecumseh is not made out. But perhaps the testimony of defendant's witness Spafford, and that of the others tending to corroborate him, ought to receive particular notice, because Spafford testifies that he got up and bound the book, and it is, therefore, not a mere matter of memory with him so far as the fact of such a book having been used there at some time is concerned; and for the further reason that if Spafford is to be believed in preference to Southworth and the witnesses tending to corroborate him, then it must be conceded that the allegation of prior use at Tecumseh is made out.

Spafford was first examined as a witness at Grand Rapids in a suit pending there involving the same issue, and subsequently at Detroit in this suit. His testimony at Grand Rapids was stipulated into this suit; and on a comparison of the two, and, in fact, of certain portions of each with other portions of the same, especially that taken at Detroit, I find his testimony in many respects inconsistent with itself, exceedingly uncertain, and in many instances palpably erroneous in respect to dates and events, so much so that the impression has been produced upon my mind, amounting almost to a conviction, that his testimony is wholly unreliable; and I am of the opinion that even if it had not been contradicted, it would, to say the least, have constituted a very unsatisfactory basis upon which to take away the complainant's prop-

erty in his invention. Were it not for extending this opinion to an unpardonable length I would detail some of the most glaring of these inconsistencies, uncertainties, and errors; but what has been already said must suffice.

When we add to the infirmities inherent in Spafford's testimony the direct contradiction of Southworth, who had full means of knowledge as to the main fact, and a greater interest than Spafford in the existence of that fact at the time, if it existed, Spafford's testimony becomes, in my estimation, utterly worthless. Spafford says Southworth paid him for getting up the book, and that the tailor and liveryman whose advertisements were inserted paid Southworth for the same. He thereby shows that if the fact existed at all Southworth was an actor in it equally with himself, and with a greater interest. In view of this, and of the additional fact, already alluded to, that if used there, it must have been under Southworth's immediate notice and supervision, and also that he describes the book that was used, Southworth's testimony is, to say the least, of as high a character and entitled to as much weight as that of Spafford. These two witnesses also stand before the court on an equality as to character and credibility. The character or reputation for truth and veracity of neither was impugned, and if the old adage "that a man may be known by the company he keeps" be true in this instance, they stand on a perfect equality as to general character by Spafford's own testimony, because he says they have been intimate friends and associates from schoolboys up.

As to the witnesses introduced by defendant to corroborate Spafford, Mrs. Hoeg, now Mrs. Stinson, who kept the house, was seldom in the office, and her recollection of such a book having been used there at any time during the few months she kept the house is, as it might be supposed to be, quite dim, shadowy, and uncertain; and it may be problematical, at least, whether her present interest in defeating complainant's alleged invention (her present husband having been sued for its infringement), has not had something to do in quickening the slight recollection to which she testified. And Gonzolus, who kept the house after Mrs. Hoeg, says in his testimony that at first his recollection of the fact was faint, but his memory was afterward revived—by what means he does not state. The testimony of the remaining witnesses for defendant is of a similarly uncertain and unsatisfactory character.

The proofs showed that the hotel building in question was consumed by fire in 1858, with its contents. The absence of the register or book used there at the time specified (1855) is, therefore, satisfactorily accounted for, and has no influence in the conclusion arrived at any further than hereafter noticed. It results that the allegation of prior use in the Michigan House at Tecumseh, in the state of Michigan, is not sustained.

3. Prior use in the Bentley House, at Dexter, in the state of Michigan, by Nelson J. Alport. Alport, with eight others, testifies to the use of advertising hotel registers, in the place named, prior to 1866, viz., in 1863, 1864, and 1865; and eight witnesses testify to the contrary. As in the instance of the alleged use at Tecumseh, so here, the hotel was destroyed by fire, after the alleged prior use, and the two register books claimed to have been so used there are represented to have been destroyed with the hotel. So that here, as in both the preceding instances, the case is left to stand exclusively upon the recollections of witnesses as to both the fact and the dates, and in this instance at ten and eleven years' distance of time.

Alport kept the Bentley House, first as tenant and then as purchaser, under one Hayes, the former owner and occupant, from the summer or fall of 1863, to January 1866, when he sold out to one Porter, who kept the house for a time, and it was finally destroyed by fire on Christmas night, 1866. Alport testified that when he went into the house in 1863, he found an advertising register there about half filled up, and that he used it for the purpose of a register till in 1864 or in 1865, when a man left another advertising register at the house, and that he used that one till he sold out to Porter in January, 1866, and left it in the house, there then being only about forty pages filled. Alport testified that Hayes, of whom he took and purchased the house, was dead, but it does not appear but that Porter, Alport's successor, was still living and within reach. Porter's testimony was not taken; but one Fenn, a person who was in the employ of Hayes at the hotel up to the time Alport took possession, and also of Bentley before Hayes, was called by complainant and testified that no such register was in the use there by Hayes or Bentley, and he describes the register which was used as a plain register. It is true Alport had the better means of knowledge as to his finding a register there and its character; but both these witnesses are about equally corroborated by others, and it must be borne in mind that Alport was directly interested to defeat complainant in this suit, for the reason that there was another suit pending against him for a like infringement. To say the most that can be said in its favor, the evidence of the existence of this supposed register of 1863 is still so contradictory and unsatisfactory that it seems to me an exceedingly unsafe basis upon which to defeat complainant's patent.

The evidence of the existence of the pretended second register used by Alport in the Bentley House is, if possible, still more contradictory and unsatisfactory. When Alport sold out to Porter, he or his wife bought a lot near the Bentley House on the same

street, and in the summer of 1866 built a new hotel, called at first the Grant House, and afterward the Dexter Exchange. In 1867 or 1868, a man left an advertising register with Alport, and it was used by him at that new house, and another was so left in 1870 or 1871. Both Alport and his wife describe the advertisements and the advertisers in the register of 1867, as almost identical with those described by Alport as contained in the pretended register of 1864. As to the existence of the register of 1867, there is an entire agreement in the testimony, and it must be regarded as established. There is much room for speculation, to say the least, as to whether the fact of the existence of the register of 1867 has not been made use of in connection with the uncertainty of the recollection of witnesses at so distant a period of time, and in regard to a matter in which most of them had no particular interest to impress their memories, to make out the existence of an advertising register in the Bentley House in 1864 and in 1865, and thus make the register of 1867 do double duty.

Alport testified that the man who left the register of 1864 said he lived in Tecumseh, and that the man who left the register of 1867 said he lived in Adrian. In a subsequent part of his testimony he seems to testify that the man who left the 1864 register said he lived in Adrian instead of Tecumseh. He also testified to a conversation with one Soulier about the man who got up and left the register of 1864, Soulier being somewhat acquainted with him; and Soulier, when put upon the stand, testifies that the man Alport talked with him about was the man who got up and left the register in 1867, and that he lived in Adrian. The man himself was not called.

Alport testified that Lutz and Harning, butchers, advertised in both the registers of 1864 and 1867. But Lutz testified, and other proofs corroborate him, that he did not come to Dexter, and was not in business there until the latter part of 1866, and of course could not have advertised in the register of 1864, as testified by Alport.

On his cross-examination Alport described the register of 1867, and the advertisements in it, giving the same descriptions he had given, in both respects, of the register of 1864, and then seeming to have noticed the identity of description, said it was the latter he supposed he was describing; and, in a subsequent part of his testimony, he attempted to give a different description of the register of 1867 and its contents, but in this he is not corroborated, he is in fact contradicted by other testimony in the case. These facts, when considered in connection with the circumstances next stated, tend to cast suspicion on his testimony. Alport having testified that he kept the Grant House and Dexter Exchange in the name of his wife, Mrs. Sarah B. Alport, the latter was served with a subpoena duces tecum, on behalf of the complainant, to bring with her all the hotel registers in her possession. She appeared in obedience to the subpoena, and was sworn and examined as a witness, but produced no registers, giving as a reason that Mr. Alport would not allow her to bring them. It is true she testified that the register of 1867, the one particularly desired, was not then in existence; but whether it was destroyed before or after Mr. Alport had given his testimony, and it had come out that it would be important and material to have the register of 1867 in court for the purpose of comparison with the description given by him of the one alleged to have existed in 1864, does not appear. All Mrs Alport can say is, that it was put in the kitchen "long ago" to be used for kindling.

The witnesses produced by defendant to corroborate Alport as to the existence of those alleged prior advertising registers, all testify from recollection, without any memoranda or writing whatever to aid their memory. Those called by complainant to prove the contrary, it is true, testify equally from memory alone, and are equally liable to be mistaken; but that does not help the defendant's case, because the burden was on him to make out his defence, by clear and satisfactory evidence, beyond a reasonable doubt; and, as we shall presently show, the testimony tending to prove the non-existence of those alleged registers is entitled to equal weight with that tending to prove their existence. It must therefore be held that the allegation of the answer of prior use of the alleged invention in the Bentley House at Dexter, by N. J. Alport, is not sustained.

4. Previous knowledge of the alleged invention by Spafford at Tecumseh, and Stiles at Jackson, both in the state of Michigan. Spafford's testimony as to alleged previous knowledge has been already considered and disposed of in connection with the alleged prior use at Tecumseh. Stiles' previous knowledge remains to be considered, and this rests on Stiles' testimony alone. This person when on the witness-stand manifested, especially on his cross-examination, a degree of recklessness, and want of appreciation of his duty as a witness and of the obligation of the oath he had taken, frequently expressed in exhibitions of contumely and of contempt for the party against whom he was called to testify, such as is seldom witnessed in a court of justice, and as destroys, in my estimation, all confidence in his honesty and truth as a witness. At all events when these infirmities in his testimony are considered in connection with his acknowledged exceedingly bad memory as to dates, where dates alone were important, and the absence of memoranda which he said he had and could produce showing the correct dates, I should feel far from justified in allowing the unsupported testimony of this man to outweigh the evidence of the patent of the novelty of the invention.

5. In addition to what has been already said, there are considerations of a general character which would have a tendency to force upon the mind almost irresistibly serious doubts of the truth of the defence set up, even if the evidence in support were uncontradicted and of a stronger character.

In the first place the defence was predicated upon alleged prior public and common use of the thing patented, and six different hotels and places were specified, while testimony was adduced as to only three hotels and places, and those, where the register or registers in use at the times specified, of whatever description, had been destroyed or could not be found.

In the next place defendant's testimony tends to show as strongly as it shows anything, that if these registers were in use at all prior to complainant's invention, they must have been in quite common use in this and other states, having been ordered by a single person a dozen at a time, and not less than a hundred having been manufactured by one person, and put afloat prior to the date of complainant's invention. And yet, not a book used or manufactured before that date was produced; and, considering the efforts made by this defendant to procure one, and the interest hotel keepers generally, or at least the large number of them against whom suits were pending for infringements, had to aid him in those efforts, it must be presumed that none could be found. The door was opened wide for the introduction of such a book in evidence if one could be found, and it was expressly left open by complainant's counsel at the hearing, and has remained open during the several months the case has been held under advisement by the court. This defendant, and those in the same interest with him—and their number and influence were not small—have not been wanting in their efforts to meet the challenge. They sent circulars and made inquiries far and wide, and offered a handsome reward for the production of a single advertising hotel register used or manufactured prior to the date of complainant's invention, and still no such book has been forthcoming. Plenty of old plain registers covering such prior dates could be found, but no advertising register; and plenty of advertising registers covering subsequent dates could be found, but not prior. The bare statement of these facts suggests to my mind a doubt, to say the least, whether there could have been a prior use or prior knowledge of the invention in question, as is alleged. To doubt in such case, as has been well said, is to solve the question in the negative.

Another consideration, and to which allusion has already been made, is, that a mere matter of dates is left to rest wholly upon the unaided memory of witnesses, who for the most part had no interest or motive in regard to the fact to impress their memory at a distance of time from eight to twenty years, and involving in most instances a difference of only one, two, or three years, whether it was before or after the date in question. A remark by Mr. Justice Swayne in his opinion in the case of Wood v. Cleveland Rolling Mills Co. [Case No. 17,941], is quite applicable here. In speaking of the proof required to sustain the defence of want of novelty, and which he speaks of as a defence usually set up in patent cases, he says: "The confidence of the attacking witnesses is often in proportion to the distance in time that one is removed from the other. Their imagination is wrought upon by the influence to which their minds are subjected, and beguiles their memory." When we add this to the fact that in every instance defendant's testimony as to prior use, weak as it is when standing alone, was contradicted by testimony entitled to equal consideration in every respect, there is really nothing left to sustain the defence. The rule of presumptions, that ordinarily a witness who testifies to an affirmative is to be preferred to one who testifies to a negative, recognized by the supreme court in Stitt v. Hindekopers, 17 Wall. [84 U. S.] 384, insisted on by the defendant's counsel, is, of course, recognized by this court as binding upon it in cases to which it applies; but in this case I think it has no application. This is quite apparent when we look at the reason for the rule, as stated by the supreme court in the case last cited (page 391), which is as follows: "Because he who testifies to a negative may have forgotten. It is possible to forget a thing that did happen. It is not possible to remember a thing that never existed."

The conflict of testimony is not whether there was or was not a register or book of some kind used at each of the hotels in question during the periods of time covered by defendant's testimony, for the witnesses on both sides are all agreed that there was; neither is it, as to some of the places, as at Sturgis and Dexter, that there was or was not an advertising register used at some time by the person named in a hotel kept by him, for as to that the witnesses are also all agreed that there was. The conflict is simply as to the description or kind of register so in use, at such prior periods of time; and in respect to Sturgis and Dexter, as to the time when they saw an advertising register in use there, in a hotel kept by the persons named, whether in 1867 or from one to three years earlier. One set of witnesses testifies in the one case that the register so used was an advertising register, and in the other case that it was at the earlier date the advertising register was used; and the other set describes the former as a plain register, and that the latter was used at the later date. Each set testifies to an affirmative equally with the other, and neither has any advantage over the other, under the rule laid down in Stitt v. Hindekopers [supra].

Upon the whole consideration, it results, that there must be a decree for the complainant, according to the prayer of his bill. Decree accordingly.

[For other cases involving this patent. see Hawes v. Cook, Case No. 6,236; Hawes v. Gage, Id. 6,237; Hawes v. Washburne, Id. 6,242.]